IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

ROBERT WILLIAM CRANK,

      Plaintiff,

v.                                            Case No.: 3:20-cv-00175

ANDREW SAUL,
Acting Commissioner of the
Social Security Administration,

      Defendant.


PROPOSED FINDINGS AND RECOMMENDATIONS

      This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 16, 17). The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the

Commissioner's decision be **AFFIRMED,** and this case be **DISMISSED** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

In May 2017, Plaintiff Robert William Crank ("Claimant"), completed an application for DIB, alleging a disability onset date of June 12, 2012 due to "diabetes, anxiety disorder, hypertension, [and] osteoarthritis." (Tr. at 383-84, 397). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 110). Claimant filed a request for an administrative hearing, which was held on December 14, 2018 before the Honorable Maria Hodges, Administrative Law Judge (the "ALJ"). (Tr. at 128-61). By written decision dated January 10, 2019, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 107-27). The ALJ's decision became the final decision of the Commissioner on January 10, 2020 when the Appeals Council denied Claimant's request for review. (Tr. at 1-7).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's Complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 11, 12, 13). Thereafter, Claimant filed a Memorandum in Support of Plaintiff's Motion for Judgment [on] the Pleadings, (ECF No. 16), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 17). The time period within which Plaintiff could file a reply to the Commissioner's brief expired. Consequently, the matter is fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 41 years old on his alleged onset date and 46 years old on his date last insured. He completed the ninth grade in high school, communicates in English, and

previously worked as a pizza delivery driver and a lubrication servicer and manager at Quik Lube. (Tr. 156, 396, 398).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the

performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 404.1520a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 404.1520a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to

4

do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* § 404.1520a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional area described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2016. (Tr. at 112, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since June 12, 2012, his alleged onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: diabetes with neuropathy, obesity, osteoarthritis, hypertension, learning disorder, depressive disorder, and anxiety disorder. (*Id.,* Finding No. 3). The ALJ also considered Claimant's scalp psoriasis and cysts and sleep apnea, but the ALJ concluded that the impairments were non-severe. (Tr. at 112-13). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the

Listing. (Tr. at 113-14, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance and stoop; occasionally kneel, crouch, or crawl; should have avoided concentrated exposure to extreme cold, wetness, and hazards of moving machinery and unprotected heights; could perform simple, routine, and repetitive tasks; occasional interaction with others; only occasional changes in the work setting; occasionally perform foot control operations and push/pull with the lower extremities; could frequently handle and finger; and could stand and walk 30 minutes at a time, four hours out of an eight hour workday.

(Tr. at 115-20, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform his past relevant work. (Tr. at 120-21, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in other substantial gainful activity. (Tr. at 121-22, Findings 7 through 10). The ALJ considered that (1) Claimant was born in 1970 and was defined as a younger individual age 18-49 on his date last insured; (2) Claimant had a limited education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 121, Findings 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as a small parts assembler, nut and bolt assembler, product inspector, table worker, and final assembler. (Tr. at 121-22, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 122, Finding

No. 11).

## IV.   **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts five challenges to the Commissioner's decision. He contends that the ALJ did not (1) develop the record, (2) perform any credibility analysis or consider his pain, (3) evaluate his combination of impairments, (4) consider his obesity, or (5) produce evidence sufficient to rebut the presumption of disability. (ECF No. 16 at 8-13).

In response to Claimant's challenges, the Commissioner argues that the ALJ thoroughly evaluated Claimant's pain complaints and found that they were not fully consistent with the record. (ECF No. 17 at 11-12). Further, the Commissioner asserts that the ALJ properly developed the record, evaluated Claimant's obesity and combination of impairments, and had no duty to rebut any presumption of disability. (*Id.* at 12-15).

## V.   **Relevant Evidence**

The undersigned considered all evidence of record and summarized below the evidence that is most relevant to the issues in dispute.

### A. *Treatment Records*

On May 16, 2013, Claimant presented to his primary care provider, Zachary Hansen, M.D. He complained that the medication Neurontin, which he was prescribed for diabetic neuropathy, made him unable to function. (Tr. at 488). Dr. Hansen found no abnormalities on examination. (*Id.*). The following month, on June 19, 2013, orthopedic surgeon Tigran Garabekyan, M.D., examined Claimant's knees following Claimant's complaints of bilateral knee pain. (Tr. at 483). Dr. Garabekyan recorded that Claimant was tender to palpation around the posterior medial joint line and had mild crepitation on patellofemoral range of motion testing, mildly painful McMurray medially without click, and prominent tibial tuberosities. (Tr. at 484). However, Claimant's alignment was

normal; he did not have joint effusion, edema, or ecchymosis; his ligaments were stable; and his sensation, reflexes, and motor examination were intact. (*Id.*). Claimant's x-ray showed mild to moderate knee osteoarthritis. (Tr. at 485). Dr. Garabekyan diagnosed Claimant with bilateral knee osteoarthritis and knee pain for which he prescribed bilateral knee injections, a left knee brace, and physical therapy. (Tr. at 484). Dr. Garabekyan noted that Claimant's left knee was worse than his right, and he planned to order a right knee brace for Claimant if the left knee brace proved beneficial. (*Id.*). Dr. Garabekyan administered Claimant's Euflexxa knee injections on July 17, 24, and 31, 2013. (Tr. at 480-82).

On November 7, 2013, Claimant told Dr. Hansen that the burning pain in the soles of his feet seemed worse recently, but he was otherwise happy with the effects of his diabetes medication and losing weight. (Tr. at 529). Claimant weighed 265 pounds, and there were no abnormalities in his physical examination. (Tr. at 530-31). Dr. Hansen prescribed Cymbalta for diabetic neuropathy. (Tr. at 531). However, Claimant again complained of diabetic neuropathy during his appointment with Dr. Hansen on February 6, 2014. He reported that the pain in his feet increased when they were flat on the floor; for instance, his feet started to burn when he took a shower. (Tr. at 525). Claimant stated that Neurontin made him sleepy, but Lyrica "worked ok" for the symptoms. (*Id.*).

Claimant followed up with Dr. Hansen on May 8, 2014. He reported that he stopped taking Neurontin because he felt like it was not working, but his "feet [had] been ok without it." (Tr. at 521). Claimant had scored high on a depression screen for which Dr. Hansen prescribed Cymbalta, but Claimant was not taking it. (*Id.*). Dr. Hansen referred Claimant to an orthopedist for his knee pain and prescribed Celexa in place of Cymbalta for depression. (Tr. at 523-24).

8

On May 29, 2014, Claimant reported to Dr. Garabekyan that the Euflexxa injections improved his knee pain for three to four months. (Tr. at 477). Claimant stated that his knee pain returned, and it was significant, particularly in his right knee. (*Id*.). Claimant explained that the pain occurred predominately when he was sitting, and he had difficulty taking his first few steps upon standing. (*Id*.). On examination, Dr. Garabekyan found some tightness and stiffness in Claimant's knees, but no mechanical symptoms, instability, or radiating pain, and no other musculoskeletal complaints. (*Id*.). Claimant's x-ray showed mild medial compartment osteoarthritis in both knees. (Tr. at 479). Dr. Garabekyan diagnosed Claimant with bilateral knee pain, osteoarthritis, and chondromalacia patella. (Tr. at 477). He ordered physical therapy and a right knee brace since Claimant stated that he had "good improvement" with the left knee brace. (*Id*.). Dr. Garabekyan planned to evaluate Claimant's progress in six weeks and consider repeat injections. (*Id*.).

Claimant presented to Dr. Hansen the following month on June 19, 2014. He advised that his insurance company declined coverage for Victoza, which Dr. Hansen prescribed to treat Claimant's diabetes, and he had not taken the medication since his last visit. (Tr. at 517). However, his blood glucose was "hovering" around 200 mg/dL.[1] (*Id*.). Claimant reported that Celexa improved his mood. (*Id*.). However, he tossed and turned at night, moving his legs due to knee pain. (*Id*.). On September 22, 2014, Dr. Hansen recorded that Claimant's blood glucose was "pretty good on medication." (Tr. at 513). Claimant was denied insurance coverage for a right knee brace, but he was wearing his left knee brace. (Tr. at 513). Otherwise, Claimant felt well, and his mood was improved

---

[1] The range of 200 mg/dL to 350 mg/dL indicates mildly elevated blood sugar. *See,* for example, https://wa.kaiserpermanente.org/kbase/topic.jhtml?docId=aa21178

with a higher dose of Celexa. (*Id.*). Dr. Hansen adjusted Claimant's diabetes medication, renewed Claimant's prescription for Celexa for depressive disorder, and prescribed Ultram for knee osteoarthritis. (Tr. at 516).

On December 22, 2014, Claimant complained to Dr. Hansen of increased knee pain. (Tr. at 509). His blood pressure and blood glucose were elevated, although his blood glucose was typically "ok" on Levemir. (Tr. at 511). Claimant stated that he was out of Ultram for osteoarthritis in his knees, and he wanted to try something different because it was not working. (Tr. at 509). Claimant noted that he took Lortab and it really controlled his knee pain. (*Id.)*. On examination, Dr. Hansen noted patella crepitus, but no swelling or erythema in Claimant's legs. (Tr. at 511). He increased Claimant's medications for hypertension and diabetes and prescribed Lortab for Claimant's knee osteoarthritis. (*Id.*).

Dr. Hansen noted on March 24, 2015 that Claimant was not compliant with glucose monitoring. (Tr. at 505). No. (*Id.*). He prescribed additional diabetes medication and advised Claimant to lose weight and stop drinking soda. (Tr. at 507). Dr. Hansen also prescribed Norco for Claimant's reported low back pain. (*Id.*). The following month, on April 13, 2015, Claimant was treated at St. Mary's Medical Center for moderate right shoulder pain without any known injury. (Tr. at 258). The attending physician prescribed naproxen and Flexeril and referred Claimant to an orthopedic surgeon. (Tr. at 260).

On June 9, 2015, Claimant presented as a new patient to primary care physician Clifton Bolinger, M.D., stating that his previous provider at Valley Health "did not interact with him at all." (Tr. at 617). Claimant questioned Dr. Bolinger as to whether his medications would stay the same because he was happy with Celexa, and he was also doing well on his hyperlipidemia and diabetes medications. (*Id.*). Claimant stated that he

10

continued to have some intermittent diffuse joint pains that were somewhat improved by his current medication regimen. (*Id*.). Dr. Bolinger recorded that all three of Claimant's right shoulder rotator cuff tests were positive, and Claimant could not laterally abduct his right arm due to pain. (Tr. at 620). Claimant had started physical therapy for right shoulder pain and received an injection in his right shoulder, but stated that the injection did not help. (Tr. at 617). Dr. Bolinger recommended that Claimant continue physical therapy and referred Claimant to an orthopedist regarding his right rotator cuff injury. (Tr. at 620). Claimant's diabetes was poorly controlled. (*Id*.). Thus, Dr. Bolinger discussed dietary efforts and adjusted Claimant's medications. (*Id*.). Claimant was also continued on medications for his well-controlled anxiety, depression, hypertension, and osteoarthritis. (*Id*.).

During Claimant's follow-up visit with Dr. Bolinger on August 11, 2015, Claimant complained of low back pain, stating that his back "lock[ed] up" when he stood up. (Tr. at 608). Claimant was "doing well" in terms of diabetes with no hypoglycemic episodes or diabetes-related complaints, and his hypertension was well controlled. (Tr. at 608, 611). Claimant was also pleased with the effects of Celexa. (*Id*.). His mood was improved, and his anxiety and depression were well controlled. (*Id*.). However, Claimant complained of insomnia and stated that he was starting to experience neuropathy in his feet. (*Id*.). Dr. Bolinger prescribed non-steroidal anti-inflammatory medication for Claimant's osteoarthritis and back pain. (Tr. at 612). He also advised Claimant to stretch and use a heat pad for back pain, as well as mention the back pain to the physical therapist that he was seeing for his shoulder issue. (*Id*.).

On October 13, 2015, Dr. Bolinger noted that Claimant's anxiety, depression, and hypertension were well controlled on his current regimen. (Tr. at 602). He also renewed

Claimant's diabetes and hyperlipidemia medications and recorded that Claimant's osteoarthritis symptoms were stable. (*Id.*). Dr. Bolinger continued Claimant's current medication for osteoarthritis, which Claimant could take as needed, and he referred Claimant to a physical therapist. (*Id.*). On April 19, 2016, Dr. Bolinger noted that Claimant's blood glucose and anxiety symptoms were poorly controlled, so he adjusted Claimant's medications. (Tr. at 592). Claimant's hypertension remained stable. (*Id.*). The following month, on May 19, 2016, Dr. Bolinger again adjusted Claimant's anxiety medication, although Claimant's mood was euthymic, and his affect was normal. (Tr. at 587). Claimant's hypertension and osteoarthritis were stable, and he was continued on diabetes medication. (*Id.*). His hypertension, diabetes, and osteoarthritis were again recorded as stable during Claimant's appointment with Dr. Bolinger on November 30, 2016. (Tr. at 556).

## B. *Evaluations and Opinions*

Kelly Robinson, M.A., performed a psychological evaluation of Claimant on June 9, 2016. Claimant's full scale IQ score on the WAIS-IV test was 79, and his scores on the WRAT-IV test were equivalent to the 2.8 grade level in word reading, 3.0 grade level in spelling, and 3.5 grade level in math computation. (Tr. at 549-50). Ms. Robinson assessed that Claimant appeared incapable of managing any benefits that he might receive due to his low score on the math computation subtest of the WRAT-IV. (Tr. at 551).

On June 16, 2017, state agency physician Narendra Parikshak, M.D., assessed Claimant's RFC based upon her review of Claimant's records. She opined that Claimant could perform work at the medium exertional level with the following postural limitations: occasional climbing of ramps, stairs, ladders, ropes, or scaffolds and crawling, and frequent balancing, stooping, kneeling, or crouching. (Tr. at 276). Dr. Parikshak

additionally assessed that Claimant should avoid concentrated exposure to extreme cold, wetness, or hazards. (Tr. at 277). Dominic Gaziano, M.D., affirmed Dr. Parikshak's RFC opinion on August 8, 2017. (Tr. at 289-90).

On June 19, 2017, state agency psychologist Paula J. Bickham, Ph.D., performed a psychiatric review technique based upon her review of Claimant's records. Dr. Bickham opined that Claimant had moderate limitation interacting with others and mild limitations in understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. at 274). She found that Claimant retained the ability to perform work-like activities that did not require functional academics and required minimal interactions with others. (Tr. at 278). Timothy Saar, Ph.D., affirmed Dr. Bickham's opinion on August 7, 2017. (Tr. at 287, 290-91).

In a letter dated October 23, 2018, Dr. Bolinger wrote that Claimant "has multiple medical conditions and is unable to work." (Tr. at 780).

### C. Claimant's Statements

During Claimant's administrative hearing on December 14, 2018, the ALJ asked Claimant to describe in his own words why he believed that he was unable to work. (Tr. at 135). Claimant responded that his combination of medications made him so dizzy that he could not hardly function correctly. (*Id*.). He said that he also could not "concentrate too much," such as to watch a movie. (*Id*.). Regarding his left knee impairment, Claimant stated that, when he woke up, he sat on the side of the bed for 45 minutes to loosen up his knee and put on his knee brace, and he then walked through the house and sat on the couch for a while. (Tr. at 138). He further testified that the bilateral knee injections only helped for three or four days. (Tr. at 139). Claimant testified that he slept with his arms

above his head due to shoulder pain; was constantly thirsty and sometimes dizzy due to diabetes; had neuropathy in his feet and hands, which made him unable to feel things with his feet and caused him to drop things; and he got up to use the restroom four or five times per night, and slept for six or seven hours total. (Tr. at 141-42, 145, 148-49). He also noted that he had gained some weight, weighing 291 pounds as opposed to his usual weight of 286 pounds at 5 feet 9 inches in height. (Tr. at 144). Claimant claimed that he could only stand for five or ten minutes, walk for three-quarters of one block, and sit for 20 minutes. (Tr. at 140-41). In terms of daily activities, Claimant stated that he mostly sat by himself and started a movie, but could not maintain concentration, and he sometimes listened to the radio. (Tr. at 146). Claimant visited with his fiancé, but he did not like to be around large groups of people. (Tr. at 143). He noted that he had psoriasis on the sides of his head and people pointed at him. (Tr. at 143-44).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir.

2001)). Instead, the Court's role is limited to ensuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  Discussion

### A.  Duty to Develop the Record

In his first challenge to the Commissioner's decision, Claimant argues that the ALJ did not fully develop the record regarding two medical opinions. An ALJ has the option of obtaining additional medical evidence, including contacting medical sources, when the evidence before the ALJ is insufficient for purposes of determining if a claimant is disabled. 20 C.F.R. § 404.1520b(c) (holding that the ALJ *may* recontact a medical source if the evidence is insufficient to determine disability). An ALJ's duty is to ensure that the record contains sufficient evidence upon which the ALJ can make an informed decision. *Ingram v. Commissioner of Social Security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); *Weise v. Astrue,* No. 1:08-cv-00271, 2009 WL 3248086 (S.D.W. Va. Sept. 30, 2009); *Jones v. Saul*, No. 1:19-cv-275-GCM, 2020 WL 2411635, at *3 (W.D.N.C. May 12, 2020). Consequently, when examining the record to determine if it is adequate to support a reasoned administrative decision, the Court looks for evidentiary gaps that resulted in "unfairness or clear prejudice" to Claimant.  *Marsh v. Harris,* 632 F.2d 296, 300 (4th Cir. 1980).

### 1.  Ms. Robinson's Opinion

The examining psychologist, Ms. Robinson, opined that Claimant appeared unable to manage any benefits that he might receive due to his low math scores on the WRAT-IV

test during the consultative examination. Claimant contends that the ALJ should have developed the record concerning the extent of Claimant's math impairment, because Ms. Robinson "failed to give any guidance as to how [Claimant's] ability would be impaired and to the extent of the impairment." (ECF No. 16 at 9). At steps two and three of the sequential evaluation, the ALJ found that Claimant's learning disorder was a severe impairment and determined that Claimant had moderate mental functional limitations. (Tr. at 112, 114). In the RFC analysis, the ALJ considered Ms. Robinson's consultative examination report, noting that she assessed impairments in reading, written expression, and math, and that Claimant scored on the 3.5 grade level in math on the WRAT-IV test administered by Ms. Robinson. (Tr. at 118). The ALJ found that Ms. Robinson's report and the opinions of the state agency psychologists were persuasive regarding Claimant's mental functional abilities. (Tr. at 120). The ALJ also considered Claimant's work history as a manager, which was classified as semi-skilled to skilled work and required Claimant to operate a cash register. (Tr. at 119).

Based on a review of the record, the undersigned **FINDS** that the ALJ was not required to recontact Ms. Robinson or otherwise develop the evidence regarding the nature and extent of Claimant's math impairment, because the record was adequate for a disability determination. Claimant fails to demonstrate that the record before the ALJ was insufficient. *Coleman v. Colvin*, 1:15CV751, 2016 WL 5372817, at *1 (M.D.N.C. Sept. 26, 2016) (holding that when there is sufficient evidence in the record, the ALJ need not seek clarification from a medical source).

Claimant underwent a consultative examination, which was reviewed by two state agency psychologists. The experts assessed that Claimant retained the ability to perform work-like activities that did not require functional academics and minimal interactions

16

with others. (Tr. at 278, 291). The ALJ also considered Claimant's function reports, work history, testimony, and other evidence. There were no inadequacies or gaps in the record that the ALJ was obligated to develop, as the record before the ALJ concerning Claimant's mental functional abilities was sufficient to perform the function-by-function analysis and make an informed decision on Claimant's disability application.

### 2. Dr. Bolinger

Claimant also indicates that the ALJ failed to develop the record regarding Dr. Bolinger's conclusory statement that Claimant had multiple medical conditions and was unable to work. (ECF No. 16 at 8). The ALJ considered this opinion, but she did not find it valuable or persuasive. (Tr. at 120). The ALJ conducted a thorough review of the medical evidence, including Dr. Bolinger's treatment records; Claimant's statements; and the opinion evidence. Furthermore, the ALJ supported her assessment with references to the evidence. In light of the substantial medical information and opinions, the record was more than adequate for the ALJ to reach a disability determination. Claimant does not identify any inadequacies or gaps in the record that the ALJ was obligated to develop regarding Dr. Bolinger's opinion.

Therefore, for all of the above reasons, the undersigned **FINDS** that the record was sufficient for the ALJ to make an informed decision and that there were not inadequacies or evidentiary gaps in the record for which the ALJ was obligated to develop the evidence.

### B. Subjective Symptoms

Claimant next argues that the ALJ failed to consider his pain or perform any credibility determination. (ECF No. 16 at 9). Under the applicable Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the

credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. § 404.1529 (effective March 27, 2017). First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* § 404.1529(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant,

18

treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. § 404.1529(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable evidence to consider may include (1) a longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other impairments, such as potential mental impairments, that could account for an individual's allegations. *Id.*

In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

19

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

20

In this case, the ALJ clearly performed the two-step process. She discussed Claimant's allegations of diabetic neuropathy in his hands and feet and pain "all over his body," which was the worst in his shoulders and knees. (Tr. at 115). The ALJ noted that Claimant reported that he continued to have significant problems despite medication, injections, and a knee brace. (*Id.*). The ALJ thoroughly discussed the medical evidence, including Claimant's subjective statements to providers, treatment records, and objective findings and test results. (Tr. at 116-18). Ultimately, after considering the evidence, the ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (Tr. at 119).

However, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record" for several reasons. (*Id.*). The ALJ cited Claimant's statements that he received special education classes, quit school in the ninth grade, and could not read or write very well, yet he stated in his disability report that he read and wrote "okay" and he worked as a manger, which was classified as semi-skilled to skilled occupation and required him to read and operate a cash register. (*Id.*). In addition, the ALJ addressed Claimant's allegation that he stopped working due to his combination of conditions, noting that Claimant reported to a provider that he was laid off from his last job when the business was sold. (*Id.*). Further, the ALJ considered the fact that there was no evidence in the record that Claimant received treatment from his onset date on June 12, 2012 until April 2013, and his treatment thereafter consisted of routine office visits for medication adjustments without any acute care being required, and Claimant reported improvement from the adjustments. (*Id.*). The ALJ cited that Claimant was also non-compliant with treatment, including drinking several liters of soda

per day and not taking certain medications, losing weight, monitoring his blood glucose, or watching his diet, which was contrary to the treatment for diabetes and obesity. (*Id.*). Finally, the ALJ noted that Claimant reported that he would cut the grass, which took several days because it was a hillside, and friends visited his home and he frequently went to his girlfriend's home. (*Id.*). The ALJ additionally considered the medical opinions and evaluations in the file. (Tr. at 119-20). For those reasons, the ALJ found that Claimant's statements concerning his impairments and their impact on his ability to work were inconsistent with his activities of daily living, clinical findings, and course of treatment. (Tr. at 119).

As shown above, the ALJ properly considered Claimant's statements, his daily activities, and the medical evidence to evaluate the intensity, persistence, and severity of Claimant's reported symptoms. Claimant offers nothing to rebut the ALJ's well-reasoned conclusions and specific citations to the record. In fact, Claimant only supported this challenge by citing a page of a rehabilitation specialist's curriculum vitae (CV) and a page of his treatment notes regarding his knee pain. (ECF No. 16 at 10); *see* (Tr. at 474, 484). The CV does not have any apparent relevance to Claimant's challenge, and the ALJ very thoroughly considered the evidence concerning Claimant's knee pain. (Tr. at 115-18). Claimant does not point to any critical evidence, which the ALJ neglected to consider and had any conceivable impact on the ALJ's decision. Therefore, the undersigned **FINDS** that substantial evidence supports the ALJ's subjective symptom analysis.

### C. Combination of Impairments

Claimant next argues that the ALJ failed to consider his combination of impairments, including diabetes with neuropathy, obesity, osteoarthritis, hypertension, learning disorder, depressive disorder, and anxiety disorder. (ECF No. 16 at 10-11). An

ALJ must consider the combined, synergistic effect of all of a claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on the claimant. *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989). The relevant regulation provides:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 404.1523. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). As the United States Court of Appeals for the Fourth Circuit stated in *Walker,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." *Walker,* 889 F.2d at 50.

Claimant mentions the foregoing legal standard, but he fails to explain how it applies to this case. (ECF No. 16 at 11). Here, the ALJ very thoroughly considered Claimant's diabetes with neuropathy, obesity, osteoarthritis, hypertension, learning disorder, depressive disorder, and anxiety disorder. The ALJ discussed, in detail,

Claimant's allegations, the objective evidence, and the opinions offered in this matter. (Tr. at 115-20). The decision clearly articulates the ALJ's well-supported rationale for finding that Claimant's impairments, alone or in combination, did not preclude him from engaging in substantial gainful activity. (*Id*.). For instance, the ALJ noted Claimant's stable mood symptoms on Celexa; stable hypertension; and improvement in osteoarthritis, neuropathy, and blood glucose control despite Claimant's obesity and failure to comply with all of the treatment recommendations. (Tr. at 116-19). The ALJ also considered Claimant's conservative treatment, daily activities, work history, and the opinion evidence. (Tr. at 119-20). To the extent that the ALJ did not elaborate further on the analysis of Claimant's impairments in combination, the undersigned finds that further elaboration was unnecessary because the required analysis clearly took place. Therefore, the undersigned **FINDS** that the ALJ complied with her duty under the applicable law to consider Claimant's impairments in combination.

### *D. Obesity*

Claimant next contends that the ALJ failed to apply SSR 02-1p in evaluating the severity of his obesity. (ECF No. 16 at 11). Obesity is identified as a medically determinable impairment and generally addressed by SSR 02–1P. 2002 WL 34686281, at *1. The Ruling identifies four ways obesity may be considered in the sequential evaluation process. It may be considered in determining whether the individual has a medically determinable impairment; whether the individual's impairment is severe; whether the individual's impairment meets or equals the requirements of a listing; and whether the individual's impairments prevent her from doing her past relevant work or other work existing in significant numbers in the national economy. *Id.* at *3. The Ruling provides that "[w]hen establishing the existence of obesity, [the SSA] will generally rely on the

judgment of a physician who has examined the claimant and reported his or her appearance and build, as well as weight and height." *Id.* Therefore, "in the absence of evidence to the contrary in the case record, [the SSA] will accept a diagnosis of obesity given by a treating source or by a consultative examiner." *Id.*

In considering obesity at step two of the sequential evaluation, "[t]here is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment," and "[n]either do descriptive terms for levels of obesity (e.g., 'severe,' 'extreme,' or 'morbid' obesity) establish whether obesity is or is not a 'severe' impairment for disability program purposes." *Id.* at *4. Ultimately, the SSA conducts an individualized assessment of an individual's obesity in determining whether an individual's obesity impacts his or her functioning to the degree that a finding of "severe" is appropriate. *Id.*

When evaluating obesity under the Listing at step three of the sequential evaluation, the SSA will not make assumptions "about the severity or functional effects of obesity combined with other impairments." *Id.* at *6. The SSA will not make such assumptions because "[o]besity in combination with impairment may or may not increase the severity or functional limitations of the other impairments." *Id.* Therefore, in each case, an individualized determination of a claimant's functional limitations as a result of obesity will be made based on the medical record. *Id.*

At steps four and five of the sequential evaluation, the SSA assesses the residual functional capacity of a claimant. The SSA recognizes that "[o]besity can cause limitation of function." *Id.* at *6. Specifically, as a result of obesity:

> An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to

25

tolerate extreme heat, humidity, or hazards may also be affected.

*Id.* The SSA must take this into consideration when completing an individualized assessment of a claimant's residual functional capacity. Ultimately, the SSA "will explain how [it] reached [its] conclusions on whether obesity caused any physical or mental limitations" with respect to a claimant's residual functional capacity. *Id.* at *7.

In this case, the ALJ found Claimant's obesity to be a severe impairment at step two of the sequential evaluation. (Tr. at 112). At step three of the sequential process, the ALJ cited the Ruling related to obesity and recognized the requirements of the Ruling in evaluating the condition. (Tr. at 113). In assessing Claimant's RFC, the ALJ discussed the medical evidence at length, including Claimant's weight and body mass index at various examinations, his diagnosis of obesity, and the impact of his obesity on his other medical conditions, such as diabetes, neuropathy, and osteoarthritis. (Tr. at 116-18). It is evident from the decision that the ALJ considered Claimant's obesity in deciding Claimant's RFC and understood that she was required to evaluate Claimant's obesity in light of SSR 02-1p. *See Michael v. Astrue*, No. 1:08-01189, 2010 WL 697000, at *15 (S.D.W. Va. Feb. 24, 2010) (adopting report and recommendation wherein magistrate judge recognized that references to claimant's obesity in summarizing medical evidence and at step two satisfied SSR 02-1p).

Furthermore, the ALJ added limitations to Claimant's RFC that could be attributable to his obesity and potential limitations that could arise from his obesity, including restricting his ability to lift, carry, stand, walk, climb, balance, stoop, kneel, crouch, or crawl. (Tr. at 115). Claimant has not pointed to any specific evidence supporting an allegation that his obesity actually causes him additional functional limitations or pain. *See Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3rd Cir. 2005) (declining to remand

where ALJ did not consider claimant's obesity because claimant failed to specify how her obesity specifically affected her ability to work other than generally stating that it made it more difficult for her to stand, walk, and use her hands and fingers); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (declining to remand where ALJ did not explicitly address claimant's obesity, claimant only speculated that his obesity affected his ability to work, and ALJ adopted limitations suggested by reviewing physicians who were aware of claimant's obesity); *Copning v. Colvin*, No. 3:14-cv-00529, ECF No. 14 at 56-57 (S.D.W. Va. Jan. 26, 2015) (rejecting argument that ALJ failed to properly consider claimant's obesity where claimant failed to cite evidence supporting allegation that obesity caused additional functional limitations), *report and recommendation adopted by* ECF No. 25 (S.D.W. Va. Mar. 30, 2015); *Michael*, 2010 WL 697000, at *15 (adopting report and recommendation wherein magistrate judge rejected claimant's argument that remand was required to consider his obesity when claimant failed to assert how his obesity contributed to his inability to work).

In addition, Claimant was obese throughout the record, yet none of the physicians opined that Claimant had any specific functional limitations related to obesity or any greater RFC limitations that the ALJ assessed. Claimant did not even list obesity as a medical condition that limits his ability to work. (Tr. at 397). Moreover, Claimant has not precisely asserted how his obesity impacts his work abilities. For all of the above reasons, the undersigned **FINDS** that the ALJ properly considered Claimant's obesity in accordance with applicable rules and regulations.

### E. *Presumption of Disability*

In his final challenge to the Commissioner's decision, Claimant contends that the ALJ failed to produce evidence sufficient to rebut the presumption of disability. (ECF No.

16 at 12-13). Claimant indicates that the evidence was "overwhelming" in his favor, and the ALJ failed to rebut it. (*Id.*). However, there is no "presumption of disability" under the Social Security Act, as Claimant suggests. A claimant is ultimately responsible for proving that he or she is disabled, and that responsibility never shifts to the Commissioner. If Claimant is suggesting that the ALJ failed to demonstrate, at the fifth step of the sequential evaluation process, that Claimant was capable of performing jobs which existed in significant numbers in the economy, that suggestion is without merit. The ALJ determined, with the help of a vocational expert, that other jobs were available in significant numbers in the national economy that Claimant could perform despite his vocational factors and history, including work as a small parts assembler, nut and bolt assembler, product inspector, table worker, or final assembler. (Tr. at 121-22). To the extent that Claimant argues that the Court should independently reevaluate Claimant's case, and reach different conclusions than the ALJ, the undersigned **FINDS** that such contention is without any legal basis.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 16); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 17); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code,

Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** February 25, 2021

Cheryl A. Eifert
United States Magistrate Judge

29